AO 93C (08/18) Warrant by Telephone or Other Reliable Electronic Means

☐ Original          ☐ Duplicate


CLERK'S OFFICE
A TRUE COPY
Dec 14, 2023
s/ Mariah Kauder
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT
### for the
### Eastern District of Wisconsin

In the Matter of the Search of          )
*(Briefly describe the property to be searched*          )
*or identify the person by name and address)*          )     Case No.   23-M-526 (SCD)
A black Apple iPhone, currently in law          )
enforcement possession, as further described          )
in Attachment A          )

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:     Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____Eastern_____ District of _____Wisconsin_____
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B.

**YOU ARE COMMANDED** to execute this warrant on or before _____12-28-23_____ *(not to exceed 14 days)*
☐ in the daytime 6:00 a.m. to 10:00 p.m.     ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____Hon. Stephen C. Dries_____ .
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)*     ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:     12-14-23. 2:00 pm          _Stephen C. Dries_
                                                                                    *Judge's signature*

City and state:     Milwaukee, WI          Honorable Stephen C. Dries, U.S. Magistrate Judge
                                                                    *Printed name and title*

| **Return** | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name(s) of any person(s) seized:

**Certification**

      I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

## ATTACHMENT A

### PROPERTY TO BE SEARCHED

The property to be searched is a black Apple iPhone with damage to the back, hereinafter "**Device A.**"

**Device A** is currently located at 11548 W. Theo Trecker Way, Milwaukee, Wisconsin.

This warrant authorizes the forensic examination of **Device A** for the purpose of identifying the electronically stored information described in Attachment B.

## ATTACHMENT B

1.      All records on the Device described in Attachment A that relate to violations of

21 U.S.C. §§ 841(a)(1), 843(b), 846, and 856(a); and 18 U.S.C. §§ 922(g) and 924(c); and involve

Montreal KELLY, including, but not limited to:

      a.   lists of customers and related identifying information;

      b.   types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

      c.   any information related to co-conspirators and sources of drugs and firearms (including names, addresses, phone numbers, or any other identifying information);

      d.   any information recording schedule or travel;

      e.   all bank records, checks, credit card bills, account information, and other financial records;

      f.   photographs and/or video depicting possession of drugs, firearms, assets, or other activities related to drug trafficking or money laundering;

      g.   any evidence related to either the ownership, purchase, or possession of drugs, firearms, and assets;

      h.   records of Internet activity, including browser history, search terms that the user entered into any Internet search engine, and records of user-typed web addresses; and

      i.   all data, communications, information, and records, in whatever form, that have any tendency to establish the actual or intended physical location of its user, or that of any of their associates involved in criminal activity, as well as the physical location of the Device;

2.      Evidence of user attribution showing who used or owned the Device at

the time the things described in this warrant were created, edited, or deleted, such as

logs, phonebooks, saved usernames and passwords, documents, and browsing history;

1

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.



CLERK'S OFFICE
A TRUE COPY
Dec 14, 2023
s/ Mariah Kauder
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>A black Apple iPhone, currently in law enforcement<br>possession, as further described in Attachment A | )<br>)<br>)<br>)<br>)<br>) |

Case No. 23-M-526 (SCD)

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

located in the _____ Eastern _____ District of _____ Wisconsin _____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(a)(1), 843(b),<br>846, & 856(a); 18 U.S.C.<br>§§ 922(g); & 924(c) | Possess with intent to distribute controlled substances, illegal use of comm facility,<br>drug conspiracy, maintain drug-involved premises; possession of a firearm as a<br>felon and in furtherance of a drug trafficking crime. |

The application is based on these facts:

See Attached Affidavit.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Robert Gregory, DEA TFO
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

_____ telephone _____ *(specify reliable electronic means)*.

Date: 12-14-23

_____
*Judge's signature*

City and state: Milwaukee, WI

Honorable Stephen C. Dries, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF AN APPLICATION
## UNDER RULE 41 FOR A SEARCH WARRANT

I, Robert Gregory, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.     I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—an electronic device—which is currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2.     I have over nine years of experience as a law enforcement officer through the Milwaukee Police Department (MPD). I am currently assigned to the North Central High Intensity Drug Trafficking Area (HIDTA) – Interdiction Unit, which is involved in the investigation of offenses involving, but not limited to, narcotics, narcotics trafficking, and individuals prohibited from possessing firearms within the City of Milwaukee. I am a federally deputized Task Force Officer with the United States Department of Justice Drug Enforcement Agency (US DOJ – DEA).   I am an investigator or law enforcement officer of the United States within the meaning of 18 U.S.C. Section 2510(7), in that I am empowered by the law to conduct investigations of and to make arrests for federal felony arrests.

3.     As a Police Officer and a Task Force Officer, I have participated in the investigation of numerous narcotics-related offenses, resulting in the prosecution and conviction of individuals and the seizure of illegal drugs, weapons, United States

currency and other evidence of criminal activity. As a narcotics investigator, I have interviewed many individuals involved in drug trafficking and have obtained information from them regarding the acquisition, sale, importation, manufacture, and distribution of controlled substances. Through my training and experience, I am familiar with the actions, habits, traits, methods, and terminology used by the traffickers and abusers of controlled substances. I have participated in all aspects of drug investigations, including physical surveillance, execution of search warrants, undercover operations, analysis of phones and the arrests of numerous drug traffickers. I have also been the affiant of many search warrants.

4.      Additionally, I have spoken with other experienced narcotics investigators on numerous occasions concerning the method and practices of drug traffickers and money launderers. Furthermore, I have attended training courses that specialized in the investigation of narcotics trafficking and money laundering. Based on my training, experience, and conversations with other law enforcement officers (LEOs), I am familiar with the ways in which drug traffickers conduct their unlawful drug trafficking activity, including, but not limited to, their methods used to manufacture, distribute, transport, store, and import controlled substances, their methods used to collect and launder trafficking-derived proceeds, their use of code words and numbers to conduct their transactions, their methods for concealing and safeguarding narcotics and narcotics proceeds, and their use of violence and threats of violence to protect their organization. I know and have observed that drug traffickers frequently possess firearms and ammunition to protect their illegal product.

5.     I am further aware of the methods employed by major narcotics organizations to thwart any investigation of their illegal activities. I am also familiar with their use of telephones, counter-surveillance, false and/or fictitious identities, and the use of coded language during conversations when referring to narcotics in an attempt to disguise the true meaning of the conversation. Finally, I know that it is common for drug traffickers to maintain evidence of their trafficking, i.e. records, receipts, notes, ledgers, airline tickets, receipts relating to the purchase of financial instruments and/or the transfer of funds and other papers relating to the transportation, ordering, sale and distribution of controlled substances, and that they are maintained where the traffickers have ready access to them, such as in their cellular telephones.

6.     Based upon my training and experience, I know that computer hardware and software may be important to a criminal investigation in two distinct and important respects: (1) the objects themselves may be instrumentalities, fruits, or evidence of crime, and/or (2) the objects may have been used to collect and store information about crimes (in the form of electronic data).  Rule 41 of the Federal Rules of Criminal Procedure permits the government to search and seize computer hardware and software which are (1) instrumentalities, fruits, or evidence of crime, or (2) storage devices for information about crime.

7.     To this end, based upon my training and experience, I know that individuals involved in drug trafficking frequently use cellular telephones to maintain contact and arrange transactions with their sources and customers of and co-conspirators in the distribution of controlled substances. I have also found it very common for crime

suspects to use their cellular telephones to communicate aurally or via electronic message in "text" format with individuals whom they purchase, trade, or otherwise negotiate to obtain illegal drugs. I also believe that it is common for crime suspects who possess illegal controlled substances and firearms to often take or cause to be taken photographs and other visual depictions of themselves, their associates, and the illegal controlled substances and firearms that they control, possess, buy, and sell.

8.    Throughout this affidavit, reference will be made to case agents. Case agents are those federal, state, and local law enforcement officers who have directly participated in this investigation, and with whom your Affiant has had regular contact regarding this investigation.

9.    This affidavit is based upon my personal knowledge, and upon information reported to me by other federal, state, and local law enforcement officers during the course of their official duties, all of whom I believe to be truthful and reliable.

10.    This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## **IDENTIFICATION OF THE DEVICE TO BE EXAMINED**

11.    The property to be searched includes a black Apple iPhone with damage to the back, hereinafter "**Device A**."

12.    **Device A** is currently located at 11548 W. Theo Trecker Way, in the City and County of Milwaukee.

4

13.     The applied-for warrant would authorize the forensic examination of the **Device A** for the purpose of identifying electronically stored data particularly described in Attachment B.

**PROBABLE CAUSE**

14.     The United States, including the North Central High Intensity Drug Trafficking Area, the Milwaukee Metro Drug Enforcement Group, and DEA, are conducting a criminal investigation of Montreal KELLY regarding possible violations of 21 U.S.C. §§ 841(a)(1) (distribution of and possession with intent to distribute controlled substances), 843(b) (illegal use of communication facility), 846 (drug conspiracy), 856(a) (maintaining a drug-involved premises); 18 U.S.C. § 922(g)(1) (felon in possession of a firearm); and 18 U.S.C. § 924(c) (possession of a firearm in furtherance of a drug trafficking crime).

**Confidential Human Source**

15.     Case agents have received information concerning the illegal drug trafficking activities of Montreal KELLY from a confidential source (hereinafter "CHS #1").

16.     Beginning in June 2023, CHS #1 made statements against CHS #1's penal interest. Thus far, the information provided by CHS #1 has been corroborated by information known to case agents gathered during the course of this investigation, including through independent investigation, various public databases, physical surveillance, and electronic surveillance. According to law enforcement databases, CHS #1 has a criminal history that includes felony drug convictions, misdemeanor convictions

including resisting or obstructing, and other drug and fraud offenses resulting in fines. CHS #1 is cooperating for consideration on pending federal drug trafficking charges. Within the context of the information detailed and relied upon for purposes of this affidavit, case agents believe CHS #1 is credible and CHS #1's information reliable.

17.     On November 1, 2023, case agents conducted a debrief with CHS #1 during which CHS #1 spoke about a person known to CHS #1 as "Blood." Case agents were aware of a person with the nickname "Blood" that was involved in the distribution of cocaine and heroin in southeastern Wisconsin who they identified as KELLY. Case agents showed CHS #1 a Milwaukee Police Department booking photograph of KELLY, and CHS #1 identified KELLY as the individual CHS #1's knows as "Blood."

18.     CHS #1 informed case agents that CHS #1 has known KELLY since approximately 2014; however, CHS #1 re-connected with him around September 2021. CHS #1 stated that during the time CHS #1 and KELLY re-connected, KELLY informed CHS #1 that he (KELLY) was involved in the distribution of cocaine and offered to provide cocaine to CHS #1. KELLY brought CHS #1 to his (KELLY's) residence, and CHS #1 described the residence's location to case agents as being a single-family residence on the corner of N. 57th Street and W. Ruby Avenue. Case agents were aware that KELLY's residence is 4503 N. 57th Street, Milwaukee, Wisconsin, the SUBJECT PREMISES, which was at the location CHS #1 described. Using a digital map, case agents showed the SUBJECT PREMISES to CHS #1, and CHS #1 identified the SUBJECT PREMISES as the residence that CHS #1 went to with KELLY. CHS #1 stated during this first interaction at the SUBJECT PREMISES, CHS #1 observed approximately 30 pounds of marijuana in

6

tall blue tinted clear bags, approximately 2 or 3 kilogram-packages of cocaine, and approximately 2 kilogram-packages of fentanyl.

19. According to CHS #1, as a result of the quantity of cocaine and heroin that KELLY was in possession of and would continue to be in possession of, CHS #1 began a drug trafficking relationship with KELLY. CHS #1 stated over the next couple of months following September 2021, CHS #1 entered the SUBJECT PREMISES multiple times a day to pick up between one and four ounces of cocaine from KELLY. CHS #1 stated KELLY would front the cocaine and CHS #1 would come back and pay KELLY around $850 per ounce for the cocaine that CHS #1 picked up. CHS #1 stated that in addition to the cocaine, KELLY fronted approximately 200 grams of pure fentanyl every week to CHS #1. CHS #1 stated that over time KELLY began to require CHS #1 to pick up more than one to four ounces of cocaine at a time to reduce the activity and frequency of visits at the SUBJECT PREMISES in an attempt to avoid law enforcement detection. CHS #1 stated this drug trafficking relationship with KELLY lasted between approximately Fall 2021 and Spring 2023.

20. CHS #1 further stated that on at least eight occasions between the beginning of 2022 and spring of 2023, CHS #1 obtained at least one kilogram of cocaine from KELLY at the SUBJECT PREMISES with an initial price of $29,000, which gradually dropped to $24,000. CHS #1 stated the most fentanyl that KELLY provided was 800 grams at one time. CHS #1 described the cocaine as a white powder substance and was sold to CHS #1 in a pure, uncut form. CHS #1 stated that KELLY also sold the fentanyl to CHS #1 in a pure form and that the fentanyl was either white or had a purple tint.

21.     CHS #1 stated KELLY was always in possession of multiple firearms inside of the SUBJECT PREMISES, and the firearms would always be different. CHS #1 recalled observing multiple different handguns and multiple different AR style rifles inside the SUBJECT PREMISES and stated that KELLY is a firearm enthusiast.  CHS #1 described one occasion in which CHS #1 observed approximately $200,000 on a table inside the SUBJECT PREMISES.

22.     An analysis of phone records for a phone number used by CHS #1 between May 2022 and October 2022 reflects that CHS #1 communicated with a phone number that law enforcement officers believed to be used by KELLY.

## Surveillance

23.     Case agents conducted surveillance at the SUBJECT PREMISES on November 10, 2023, at approximately 1:55 p.m.  During this surveillance episode case agents observed KELLY's girlfriend/child's mother, identified as Fredricka Rivera (XX/XX/1991), arrive at the residence in a black GMC Yukon bearing WI auto plate ASL2452. Case agents observed KELLY exit from the side/south facing door of the residence and thereafter assisted Rivera in escorting two children from the vehicle and into the residence. Rivera then removed groceries from the vehicle and entered the residence with KELLY.  Case agents also observed a white Cadillac CTS bearing WI auto plate ASA2186 parked on the street in front of the residence and in front of where Rivera parked the GMC. A Wisconsin Department of Transportation check of the GMC revealed it is registered to Rivera at the SUBJECT PREMISES. A Wisconsin Department of Transportation check of the Cadillac revealed it is registered to both Rivera and KELLY

at the SUBJECT PREMISES.

24.     On November 29, 2023, case agents conducted surveillance at the SUBJECT PREMISES and observed the same black GMC Yukon and a white Cadillac Deville bearing WI auto plate AMF3108 parked in the driveway of the residence.   At approximately 8:55 a.m., KELLY was observed exiting the residence and proceeded to remove both vehicles from the driveway and parked them in front of the residence and then returned inside the residence.  A Wisconsin Department of Transportation check of this Cadillac revealed it is registered to Rivera at the SUBJECT PREMISES.

25.     On December 5, 2023, case agents conducted surveillance at the SUBJECT PREMISES. At approximately 10:29 a.m., case agents observed KELLY arrive at the residence in his white Cadillac CTS and pull the vehicle into the garage. Case agents observed KELLY approach the residence and further observed a black handle protruding outwards from KELLY's right side waistband, which case agents believe through their training and experience to be the handle of a firearm. KELLY thereafter entered the SUBJECT PREMISES.

26.     On December 6, 2023, case agents conducted surveillance at the SUBJECT PREMISES. At approximately 9:47 p.m., KELLY was observed exiting the side door of the residence along with a child who appeared to be approximately 5 years old.  KELLY and the child approached the GMC Yukon.  KELLY was then observed re-approaching the side door of the SUBJECT PREMISES. Upon arriving at the door, KELLY proceeded to remove a black handgun from the right side of his waistband and began using the butt of the firearm to knock on the side door of the residence.  The door opened and KELLY

entered the residence for a short time before returning to the GMC Yukon and leaving the SUBJECT PREMISES driving the GMC.

## Criminal History

27.     A check of Wisconsin Circuit Court Access revealed KELLY is convicted of two counts of Burglary-Building or Dwelling, in violation of Wisconsin State Statute 941.10(1m)(a) in Milwaukee County Case No. 2011CF007115, which is a felony offense. KELLY is therefore prohibited from possessing firearms.

## Search Warrant Executed at the SUBJECT PREMISES

28.     On or about December 8, 2023, the Honorable Stephen C. Dries authorized a search warrant for the SUBJECT PREMISES.

29.     On December 12, 2023, law enforcement officers executed the search warrant at the SUBJECT PREMISES. Officers were delayed in making entry into the residence because the occupants had moved a couch to block the front door. Upon entering the residence, KELLY was observed coming up from the basement. Officers also encountered Rivera and three young children in the residence.

30.     Upon searching, officers observed water on the toilet seat and on the floor of the bathroom, along with a razor blade wrapped in what appeared to be a towel, and stray U.S. currency strewn about the bathroom floor. In the kitchen, law enforcement officers located and seized a black digital scale and a kitchen knife covered in white residue on the kitchen counter. The scale and knife were located on top of a dumbbell weight, which officers believe based on their training and experience can be used as makeshift drug press.  Officers also located numerous open sandwich boxes and loose

unused and used clear plastic sandwich bags on the kitchen counter and in a kitchen drawer. In the kitchen cabinet above the microwave, officers located a clear plastic bag containing a white powder substance, a Pyrex measuring cup with white residue, and baking soda. Officers also seized a loaded, silver-over-black, Smith and Wesson 9mm semi-automatic handgun, bearing Serial Number FBB3648, which was lying on the kitchen counter. KELLY's wallet was on the kitchen counter directly next to the firearm. Officers also located a small amount of marijuana and some loose ammunition from a kitchen drawer. In the basement, officers located three blenders with white powder residue and another Pyrex measuring cup with white residue. Additionally, officers located digital scales in two of the vehicles and a small amount of white powder in a plastic bag in one of the vehicles. Based on their training and experience, case agents believe that the evidence located in KELLY's residence is consistent with him using the residence to manufacture controlled substances.

31.    Officers subjected the seized white powder substances to field testing, which tests were inconclusive for the presence of controlled substances. The substances will be sent to the laboratory for further testing.

32.    On the morning of December 12, 2023, KELLY stated that the firearm located in the SUJBECT PREMISES belonged to his girlfriend, Rivera. Rivera was questioned about the firearm, and she stated that the firearm was hers, that she purchased it, and that she knew KELLY had possession of it the previous few days. Rivera stated that KELLY would go into the basement and use the blender to mix controlled substances in the residence. Rivera further stated that when officers began knocking on the door,

KELLY was in the bathroom, ran downstairs, and then ran back to the bathroom. Based on their training and experience, as well as the evidence gathered during the course of the investigation, case agents believe that KELLY flushed controlled substances down the toilet before law enforcement officers entered the premises.

33.     KELLY was arrested on December 12, 2023 and was thereafter charged by criminal complaint on this same day with controlled substance and firearms offenses, in violation of 21 U.S.C. § 856(a)(1) and 18 U.S.C. §§ 922(g)(1), 924(a)(8), and 924(c)(1)(A)(i). *See United States v. Montreal Kelly*, Case No. 23-M-517. Upon his arrest, located in KELLY's front left pants pocket was a black Apple iPhone with damage to the back, **Device A**. KELLY was not willing to provide case agents with the passcode to **Device A**.

34.     **Device A** is currently in the lawful possession of the Milwaukee Police Department (MPD). **Device A** came into MPD's possession after it was seized incident to KELLY's arrest.

35.     **Device A** is currently in storage at 11548 W. Theo Trecker Way, West Allis, Wisconsin.  In my training and experience, I know that **Device A** has been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when **Device A** first came into the possession of the DEA.

36.     Based on their training, experience, and knowledge of this investigation, case agents believe that contained within the **Device** is evidence of drug trafficking, possession of firearms, and the disposition of large sums of U.S. currency.

## TECHNICAL TERMS

37.     Based on my training and experience, I use the following technical terms to convey the following meanings:

a.      Wireless telephone:  A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b.      Digital camera:  A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film.  Digital cameras use a variety of fixed and removable storage media to store their recorded images.  Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader.  Removable storage media include various types of

flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

      c.     Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

      d.     GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a

computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

      e.      PDA:  A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

      f.      IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

15

g.      Internet: The Internet is a global network of computers and other electronic devices that communicate with each other.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

1.      Based on my training, experience, and research, I know that the **Device** has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

40.      Based on my knowledge, training, and experience, I know that electronic devices—like the **Device**—can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on such devices.  This information can sometimes be recovered with forensics tools.

41.      *Forensic evidence.*  As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the **Device** was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the **Device** because:

a.      Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b.      Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c.      A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d.      The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.      Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

42.     *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of **Device A**

17

consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

43.     *Manner of execution.*  Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## <u>CONCLUSION</u>

44.     I submit that this affidavit supports probable cause for a search warrant authorizing the examination of **Device A** described in Attachment A to seek the items described in Attachment B.

# ATTACHMENT A

## PROPERTY TO BE SEARCHED

The property to be searched is a black Apple iPhone with damage to the back, hereinafter "**Device A.**"

**Device A** is currently located at 11548 W. Theo Trecker Way, Milwaukee, Wisconsin.

This warrant authorizes the forensic examination of **Device A** for the purpose of identifying the electronically stored information described in Attachment B.

## ATTACHMENT B

1.     All records on the Device described in Attachment A that relate to violations of 21 U.S.C. §§ 841(a)(1), 843(b), 846, and 856(a); and 18 U.S.C. §§ 922(g) and 924(c); and involve Montreal KELLY, including, but not limited to:

   a.  lists of customers and related identifying information;

   b.  types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

   c.  any information related to co-conspirators and sources of drugs and firearms (including names, addresses, phone numbers, or any other identifying information);

   d.  any information recording schedule or travel;

   e.  all bank records, checks, credit card bills, account information, and other financial records;

   f.  photographs and/or video depicting possession of drugs, firearms, assets, or other activities related to drug trafficking or money laundering;

   g.  any evidence related to either the ownership, purchase, or possession of drugs, firearms, and assets;

   h.  records of Internet activity, including browser history, search terms that the user entered into any Internet search engine, and records of user-typed web addresses; and

   i.  all data, communications, information, and records, in whatever form, that have any tendency to establish the actual or intended physical location of its user, or that of any of their associates involved in criminal activity, as well as the physical location of the Device;

1

2. Evidence of user attribution showing who used or owned the Device at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.